# IN THE CIRCUIT COURT OF THE EIGHT JUDICIAL CIRCUIT

## IN AND FOR BAKER COUNTY, FLORIDA

Hamza Maldonado
James Hill
    *Plaintiff*

Vs

CASE: # 3:20-cv-193-J-20 PDB

FIRST AMENDMENT VIOLATION
**MEMORANDUM OF LAW**
**JURY TRIAL DEMANDED**

Baker County Sheriff's Office
Scotty Rhoden
James Messer
Evelyn Blue, Captain
    *Defendants*

_____/

FILED FOR RECORD
2020 FEB -6 A 10: 46
STACIE D. HARVEY
CLERK OF COURTS
BAKER COUNTY, FL

## FIRST AMENDMENT VIOLATION

**COMES NOW,** the Plaintiff Mr. Hamza Maldonado, and James Hill proceeding pro-*se* Pursuant to, Florida Rules of Civil Procedure, brings this Civil Action law suit for violation of religious rights.

## JURISDICTION AND VENUE

This court has jurisdiction, and venue is proper because a substantial part of the events or omission giving rise to the claim occurred in this district. This action arises in the Baker County. The defendant's place of Business is Baker County Sheriff's Office 1 Sheriff's office DR MacClenny FL 32063

# INTRODUCTION
# FLORIDA CONSTITUTION

The Plaintiffs Are Sunni Muslims, and are follows of the Qur'an and Sunnah. The religion of Islam is recognized, worldwide, as a valid religious practice with over 1 billion adherents. Therefore, the plaintiff has a clear legal right under the U.S. and Florida Constitutions. The 1st Amendment to the U.S. Constitution state:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof... "Art 1 and 3 of the Florida Constitution states "there shell be no law respecting an establishment of religion of prohibiting or panelizing the free exercise thereof... the plaintiff has been prohibited from fully practicing his religion since he has been in confinement.

## PLAINTIFF ONE

Plaintiff Mr. Hamza Maldonado resides in New York City with his family. Were he received a High school diploma and who is also a New York City Civil litigation rights advocate. His last Civil rights walk was in 2015 for the sister Hijab walk for the respect of woman Brooklyn NY. Mr. Maldonado is also further educated in matters of civil and criminal law, and is also a paralegal and civil advocate of New York City. Mr. Maldonado is also an Imam of the Muslim community, and has also conducted Jummah service on the outside and at the Baker County Detention Center.

Mr. Maldonado is also a practicing Muslim and is and has been an adherent of the Muslim religion for more than 10 years. In accordance with his religious belief and as a part of the exercise of his religion, Mr. Maldonado always attends Jummah religious prayer service.

## PLAINTIFF 3

Plaintiff Mr. James Hill resides in the state of Florida with his family. Were he received a High school diploma.

Mr. Hill is also a practicing Muslim and is and has been an adherent of the Muslim religion for many years. In accordance with his religious belief and as a part of the exercise of his religion, Mr. Hill always attends Jummah religious prayer service.

## DEFENDANTS

Defendants Baker County is a political subdivision, organized under the laws of the state of Florida. At all times relevant to this complaint, Defendant Baker county sheriff's office employed Defendants responsible for the violation of Mr. Maldonado religious rights. The Baker County Detention Center Is a department of Baker County.

On information and belief, Baker County receives federal financial assistance as well as financial assistance from the state of Florida.

Defendant Scotty Rhoden is the Sheriff of Baker County. As such he has overall supervisory responsibility for the policies and procedures of the baker County Detention Center are in accordance with Federal law, state, and municipal laws to corrections, at all times relevant to this complaint, Defendants were acting within the scope of their employment and under color of law. Defendants are sued in both their individual and official capacities.

Defendants are persons who engaged in, were aware of, and participated in, and/or directed the acts alleged herein. At all times relevant to this complaint, Defendants were acting within the scope of their employment and under color of law. Defendants are sued in both their individual and official capacities.

On information and belief, each of the Defendants was, in whole or in part, legally responsible for the denial of Plaintiff's right to practice his religion, in violation of the laws complained under herein.

# FACTUAL ALLEGATIONS

### Plaintiff's Religious Practice of Jummah service

Many Muslim Men and Women must in accordance with their religious beliefs that are based on their understanding of Koran (Qur'an), the primary holy book of the Muslim religion, the Hadith (or ahadith), oral traditions coming from the era of the Prophet Muhammed$^{(PBUH)}$, and other religious text and interpretations, must go to Muslim Jummah service. Muslim Women must also be given this right and cannot be denied if they make a choice to attend Jummah service.

Mr. Maldonado, and Mr. Hill have studied religious text, though deeply, and prayed about their practice for many years. To Mr. Maldonado, and Mr. Hill, and among other Muslim men and women attending Jummah service is a reminder of their faith, and of their religious obligations to always attend this obligated practice, and to be denied that right is a serious breach of faith, an experience that substantially burdens their religious practice.

# RELEVANT FACTS

By this complaint, Plaintiff Hamza Maldonado, and Mr. Hill seeks relief from the substantial burden that Baker County, its officers, and its agents unlawfully imposed on the practice of his religion.

Mr. Maldonado, and Mr. hill are practicing Muslim American who was denied the rights to participate in Jummah Religious Service. While in confinement at Baker County Defendants refused to allow Mr. Maldonado and Mr. Hill attend Jummah service without any valid security concerns. As a result of the foregoing deprivation of the free exercise of his religion, Mr. Maldonado and Mr. Hill was not able to go to Jummah[1] service.

# DEFENDANTS CULPABILITY AND MATTERS RELATED TO MR. MALDONADO

## ANALYSIS

On information and belief, defendants Baker County and its employees and agents prohibited Plaintiff's from attending Jummah service because of the fact that Plaintiffs are in a confinement dorm under no disciplinary action. And this denial is only because of a custom, practice, or official policy. Defendants had no reasonable basis to believe that their actions in prohibiting Plaintiffs from practicing their religion while in confinement were lawful. The right that they sought to exercise and the fact that defendant's actions violated that right were clearly established and well settled law. In particular, as detention official,

---

[1] Unlike other Muslim prayers which are performed individually and can be made up if missed, the Jummah is obligatory, cannot be made up, and must be performed in congregation. The Jummah is therefore regarded as the central service of the Muslim religion, and the obligation to attend is commanded by the Quran, the central book of the Muslim religion.

Jummah therefore cannot be regarded as one of several essentially fungible religious practices. The ability to engage in other religious activities cannot obscure the fact that the denial at issue in this case is absolute: respondents are completely foreclosed from participating in the core ceremony that reflects their membership in a particular religious' community. If a Catholic -prisoner were prevented from attending Mass on Sunday, few would regard that deprivation as anything but absolute, even if the -prisoner were afforded other opportunities to pray, to -discuss the Catholic faith with others, and even to avoid eating meat on Friday if that were a preference. Prison officials in this case therefore cannot show that other avenues remain available for the exercise of the asserted right. Turner, ante, at 90 (quoting Jones v. North Carolina Prisoners Union, 433 U.S. 119, 131 (1977)).

defendants and Sheriff should have known about the clearly established law prohibiting defendants from imposing a substantial burden on religious exercise in the absence of a compelling government interest.

Surely if the Baker County Detention center can provide Plaintiffs recreation in the Rec-room to play games and use the phone for 1 hour in with the same room Jummah service is used for, then surly he should be able to attend this service as well. Plaintiffs are also allowed to go to sick call with other inmates, law library, and outside hospital trips, and if all the above is allowable, then surely Plaintiffs should be allowed to attend Jummah service in the same rec-room that Jummah service takes place. If Plaintiffs can be walked in to the rec-room and un-handcuffed to use his one-hour rec-time, then surely Plaintiffs can be waked to the same rec-room to practice their faith.

Furthermore, Jummah service should also be provide for the Muslim women as well, because they have a legal and religious right to attend the service as well.

## GRIEVANCE PROCEDURE AND EXHAUSTION OF AVAILABLE ADMINISTRATIVE REMEDIES

Mr. Maldonado has exhausted all remedies related to this claim during his 4-month confinement related to a DR and he was denied Jummah service then, in violation of his rights. And he is being denied the right again, and is not under disciplinary action. Mr. James Messer will be named as a defendant in this action because during his time as an employee he was responsible for denying Mr. Maldonado his religious right to attend service. Capt. Evelyn Blue will also be named a defendant in this action because she is responsible in part of jail policy and has also denied Mr. Maldonado his religious right to attend service. The Baker County Sheriff's Office and Scotty Rhoden have been named defendants. As such he has overall supervisory responsibility for the policies and procedures of the baker County Detention Center are in accordance with Federal law, state, and municipal laws to corrections, at all times relevant to this complaint.

## GRIEVANCE PROCEDURE AND EXHAUSTION OF AVAILABLE ADMINISTRATIVE REMEDIES RELATED TO MUSLIM WOMAN

There are no administrative remedies for Muslim Women there are simply not allowed to go to Jummah service. And this is a major violation of their faith and practice.

## GRIEVANCE PROCEDURE AND EXHAUSTION OF AVAILABLE ADMINISTRATIVE REMEDIES RELATED TO MR HILL.

There is no grievance remedy for Mr. Hill because the denial at issue in this case is absolute

## CONCLUSION

For the forgoing reasons, we respectfully submit that the defendants erred by denying the plaintiff' s their constitution and religious rights to participate in Jummah service.

# PRAYER FOR RELIEF

The Plaintiff's therefore respectfully requests that this court enter a judgment against including, but not limited to:

    A. Punitive damages to be proven at trail
    B. Compensatory damages in the amount $150.000 against each defendant
    C. Nominal damages to be proven at trail
    D. Compensation for time and labor it took to ready this form in the amount of $500.00 plus court cost and all fees related to the filing of this complaint
    E. Costs and reasonable attorney fees: and
    F. Such additional and further relief as the court deem just and equitable
    G. Plaintiff also seeks jury trial on all issues triable by jury
    H. Plaintiff also respectfully request that the court appoint counsel.

# VERIFICATION

I have read the forgoing complaint and hereby verify that the matters alleged therein are true, except as to matter alleged on information and belief, and, as to those I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I provided a true correct copy of the foregoing motion In the hands of Department officials at Baker County Detention Center on 2/4/2020 for mailing via U.S Postal Service. To the clerk of court at 339 E. MacClenny FL 32063

Respectfully Submitted,
/s/HAMZA MALDONADO
HAMZA MALDONADO
Civil Rights Litigation
Advocate of NYC
P.O. Box 1629
MacClenny FL 32063

# VERIFICATION

I have read the forgoing complaint and hereby verify that the matters alleged therein are true, except as to matter alleged on information and belief, and, as to those I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

# **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I provided a true correct copy of the foregoing motion In the hands of Department officials at Baker County Detention Center on 2/4/2020 for mailing via U.S Postal Service. To the clerk of court at 339 E. MacClenny FL 32063

Respectfully Submitted,
/s/ James Hill
James Hill
P.O. Box 1629
MacClenny FL 32063

# MEMORANDUM OF LAW RELATED TO JUMMAH SERVICE BY

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

The religious ceremony that these respon-dents seek to attend is not presumptively dangerous, and the prison has completely foreclosed respondents participation in it. I therefore would require prison ofcials to demonstrate that the restrictions they have imposed are necessary to further an important government interest, and that these restric-tions are no greater than necessary to achieve prison objectives. See Turner v. Saey, ante, at 101, n. 1 (STEVENS, J., concurring in part and dissenting in part) (citing Abdul Wali v. Coughlin, 754 F.2d 1015 (CA2 1985) ).

As a result, I would afthe Court of Appeals order to remand the case to the District Court, and would require prison ofcials to make this showing. Even were I to accept the Courts standard of review, however, I would remand the case to the District Court, since that court has not had the opportunity to review respondents claim under the new standard established by this Court in Turner. As the record now stands, the reasonableness of foreclosing respon-dents participation in Jumuah has not been established.

*I*

Prisoners are persons whom most of us would rather not think about. Banished from everyday sight, they exist in a shadow world that only dimly enters our awareness. They are members of a total institution that con-trols their daily existence in a way that few of us can imagine:

Prison is a complex of physical arrange-ments and of measures, all wholly gov-ernmental, all wholly performed by agents of government, which determine the total existence of certain human beings (except perhaps in the realm of the spirit, and inevitably there as well) from sundown to sundown, sleeping, waking, speaking, silent, working, playing, viewing, eat-ing, voiding, reading, alone, with others. It is not so, with members of the general adult population. State

governments have not undertaken to require members of the general adult
population to rise at a certain hour, retire at a certain hour, eat at a cer-tain hour,
live for periods with no compan-ionship whatever, wear certain clothing, or submit
to oral and anal searches after visiting hours, nor have state governments
undertaken to prohibit members of the general adult population from speaking to
one another, wearing beards, embracing their spouses, or corresponding with their
lovers. Morales v. Schmidt, 340 F.Supp. 544, 550 (WD Wis. 1972).

It is thus easy to think of prisoners as mem-bers of a separate netherworld, driven
by its own demands, ordered by its own customs, ruled by those whose claim to
power rests on raw necessity. Nothing can change the fact, however, that the
society that these prison-ers inhabit is our own. Prisons may exist on the margins
of that society, but no act of will can sever them from the body politic. When
prisoners emerge from the shadows to press a constitutional claim, they invoke no
alien set of principles drawn from a distant culture. Rather, they speak the language
of the char-ter upon which all of us rely to hold ofcial power accountable. They ask
us to acknowl-edge that power exercised in the shadows must be restrained at least
as diligently as power that acts in the sunlight.

In reviewing a prisoners claim of the infringement of a constitutional right, we
must therefore begin from the premise that, as members of this society, prisoners
retain constitutional rights that limit the exercise of ofauthority against them. See
Bell v. Wol441 U.S. 520, 545 (1979). At the same time, we must acknowledge that
incar-ceration by its nature changes an individual's status in society. Prison ofcials
have the dif-and often thankless job of preserving security in a potentially
explosive setting, as well as of attempting to provide rehabilitation that prepares
some inmates for re-entry into the social mainstream. Both these demands require
the curtailment and elimination of certain rights.

The challenge for this Court is to determine how best to protect those prisoners
rights that remain. Our objective in selecting a stan-dard of review is therefore not,
as the Court declares, to ensure that courts afford appro-priate deference to prison
ofcials. Ante, at 349. The Constitution was not adopted as a means of enhancing
the efciency with which government ofcials conduct their affairs, nor as a blueprint
for ensuring suf-reliance on administrative expertise. Rather, it was meant to
provide a bulwark against infringements that might otherwise be justied as
necessary expedients of gov-erning. The practice of Europe, wrote James Madison,

was charters of liberty . . . granted by power; of America, charters of power granted by liberty. 6 Writings of James Madison 83 (G. Hunt ed. 1906). While we must give due consideration to the needs of those in power, this Courts role is to ensure

that fundamental restraints on that power are enforced.

In my view, adoption of reasonableness as a standard of review for all constitutional challenges by inmates is inadequate to this task. Such a standard is categorically def-erential, and does not discriminate among degrees of deprivation. From this perspective, restricting use of the prison library to certain hours warrants the same level of scrutiny as preventing inmates from reading at all. Various factors may be weighed differently in each situation, but the message to prison ofis clear: merely act reasonably and your actions will be upheld. If a directive that ofact reasonably were deemed sufcient to check all exercises of power, the Constitution would hardly be necessary. Yet the Court deems this single standard ade-quate to restrain any type of conduct in which prison ofmight engage.

It is true that the degree of deprivation is one of the factors in the Courts reasonable-ness determination. This by itself does not make the standard of review appropriate, however. If it did, we would need but a sin-gle standard for evaluating all constitutional claims, as long as every relevant factor were considered under its rubric. Clearly, we have never followed such an approach. A standard of review frames the terms in which justica-tion may be offered, and thus delineates the boundaries within which argument may take place. The use of differing levels of scrutiny proclaims that on some occasions ofcial power must justify itself in a way that other-wise it need not. A relatively strict standard of review is a signal that a decree prohibiting a political demonstration on the basis of the participant's political beliefs is of more seri-ous concern, and therefore will be scrutinized more closely, than a rule limiting the num-ber of demonstrations that may take place downtown at noon.
Thus, even if the absolute nature of the deprivation may be taken into account in the Courts formulation, it makes a difference that this is merely one factor in determining if ofcial conduct is reasonable. Once we provide such an elastic and deferential prin-ciple of justithe principle . . . lies about like a loaded weapon ready for the hand of any authority that can bring forth a plausible claim of an urgent need. Every repetition imbeds that principle more deeply in our law and thinking

and expands it to new purposes. Korematsu v. United States, 323 U.S. 214, 246 (1944) (Jackson, J., dis-senting). Mere assertions of exigency have a way of providing a colorable defense for governmental deprivation, and we should be especially wary of expansive delegations of power to those who wield it on the margins of society. Prisons are too often shielded from public view; there is no need to make them virtually invisible.

An approach better suited to the sensitive task of protecting the constitutional rights of inmates is laid out by Judge Kaufman in Abdul Wali v. Coughlin, 754 F.2d 1015 (CA2 1985). That approach maintains that the degree of scrutiny of prison regulations should depend on the nature of the right being asserted by prisoners, the type of activity in which they seek to engage, and whether the challenged restriction works a total deprivation (as opposed to a mere limitation) on the exercise of that right. Id., at 1033. Essentially, if the activity in which inmates seek to engage is presumptively dangerous, or if a regulation merely restricts the time, place, or manner in which prisoners may exercise a right, a prison regulation will be invalidated only if there is no reasonable justifor of cial action. Ibid. Where exercise of the asserted right is not presumptively dangerous, how-ever, and where the prison has completely deprived an inmate of that right, then prison ofcials must show that a particular restric-tion is necessary to further an important gov-ernmental interest, and that the limitations on freedoms occasioned by the restrictions are no greater than necessary to effectuate the governmental objective involved. Ibid.

The courts analytical framework in Abdul Wali recognizes that in many instances it is inappropriate for courts to substitute our judgments for those of trained professionals with years of experience. Ibid. It would thus apply a standard of review identi-cal to the Courts reasonableness standard in a signipercentage of cases. At the same time, the Abdul Wali approach takes seri-ously the Constitutions function of requiring that ofpower be called to account when it completely deprives a person of a right

that society regards as basic. In this limited number of cases, it would require more than a demonstration of reasonableness to justify such infringement. To the extent that prison is meant to inculcate a respect for social and legal norms, a requirement that prison of-cials persuasively demonstrate the need for the absolute deprivation of inmate rights is consistent with that end. Furthermore, prison ofcials are in

control of the evidence that is essential to establish the superiority of such deprivation over other alternatives. It is thus only fair for these ofto be held to a stringent standard of review in such extreme cases.

The prison in this case has completely pre-vented respondent inmates from attending the central religious service of their Muslim faith. I would therefore hold prison of cials to the standard articulated in Abdul Wali, and would their proffered justi cations wanting. The State has neither demonstrated that the restriction is necessary to further an important objective nor proved that less extreme measures may not serve its purpose. Even if I accepted the Courts standard of review, however, I could not conclude on this record that prison ofhave proved that it is reasonable to preclude respondents from attending Jumuah. Petitioners have provided mere unsubstantiated assertions that the plau-sible alternatives proposed by respondents are infeasible.

II

In Turner, the Court set forth a framework for reviewing allegations that a constitutional right has been infringed by prison ofcials. The Court found relevant to that review whether there are alternative means of exer-cising the right that remain open to prison inmates. Ante, at 90. The Court in this case acknowledges that respondents sincerely held religious beliefs compe[l] attendance at Jumuah, ante, at 345, and concedes that there are no alternative means of attending Jumuah. Ante, at 351. Nonetheless, the Court nds that prison policy does not work a complete deprivation of respondents asserted religious right, because respondents have the opportunity to participate in other religious activities. Ante, at 352. This analysis ignores the fact that, as the District Court found, Jumuah is the central religious ceremony of Muslims, comparable to the Saturday service of the Jewish faith and the Sunday service of the various Christian sects. Shabazz v. OLone, 595 F.Supp. 928, 930 (NJ 1984). As with other faiths, this ceremony provides a special time in which Muslims assert their identity as a community covenanted to God. Brief for Imam Jamil Abdullah Al-Amin et al. as Amici Curiae 32. As a result: unlike other Muslim prayers which are performed individually and can be made up if missed, the Jumuah is obligatory, cannot be made up, and must be per-formed in congregation. The Jumuah is therefore regarded as the central service of the Muslim religion, and the obligation to attend is commanded by the Quran, the central book of the Muslim religion.

Jumuah therefore cannot be regarded as one of several essentially fungible religious practices. The ability to engage in other religious activities cannot obscure the fact that the denial at issue in this case is abso-lute: respondents are completely foreclosed from participating in the core ceremony that reects their membership in a particular religious community. If a Catholic prisoner were prevented from attending Mass on Sunday, few would regard that deprivation as anything but absolute, even if the prisoner were afforded other opportunities to pray, to discuss the Catholic faith with others, and even to avoid eating meat on Friday if that were a preference. Prison ofin this case therefore cannot show that other ave-nues remain available for the exercise of the asserted right. Turner, ante, at 90 (quoting Jones v. North Carolina Prisoners Union, 433 U.S. 119, 131 (1977) ).

Under the Courts approach, as enunciated in Turner, the availability of other means of exercising the right in question counsels con-siderable deference to prison of cials. Ante, at 90. By the same token, the inof an absolute deprivation should require more than mere assertion that such a deprivation is nec-essary. In particular, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exag-gerated response to prison concerns. Ibid. In this case, petitioners have not established the reasonableness of their policy, because they have provided only bare assertions that the pro-posals for accommodation offered by respon-dents are infeasible. As discussed below, the federal policy of permitting inmates in federal prisons to participate in Jumuah, as well as Leesburgs own policy of permitting partici-pation for several years, lends plausibility to respondents suggestion that their religious practice can be accommodated.

In Turner, the Court found that the practices of the Federal Bureau of Prisons were relevant to the availability of reasonable alternatives to the policy under challenge. In upholding a ban on inmate-to-inmate mail, the Court noted that the Bureau had adopted substantially similar restrictions. Ante, at 93 (citing 28 CFR 540.17 (1986) ). In nd-ing that there were alternatives to a stringent restriction on the ability to marry, the Court observed that marriages by inmates in federal prisons were generally permitted absent a threat to security or public safety. See ante, at 97 (citing 28 CFR 551.10 (1986) ). In the present case, it is therefore worth noting that Federal Bureau of Prisons regulations require the adjustment of work

assignments to per-mit inmate participation in religious ceremo-nies, absent a
threat to security, safety, and good order. 28 CFR 548.14 (1986). The Bureaus
Directive implementing the regula-tions on Religious Beliefs and Practices of
Committed Offenders, 28 CFR 548.10 548.15 (1986), states that, with respect to
scheduling religious observances, the more central the religious activity is to
the tenets of the inmates religious faith, the greater the presumption is for relieving
the inmate from the institution program or assignment. App. to Brief for
Respondents 8a. Furthermore, the Chaplain Director of the Bureau has spo-ken
directly to the issue of participation of Muslim inmates in Jumuah:

Provision is made, by policy, in all Bureau facilities for the observance of Jumu-ah
by all inmates in general population who wish to keep this faith practice. The
service is held each Friday afternoon in the general time frame that corresponds to
the require-ments of Islamic jurisprudence. . . .

Subject only to restraints of security and good order in the institution all routine
and normal work assignments are suspended for the Islamic inmates to ensure
freedom to attend such services. . . .

In those institutions where the outside work details contain Islamic inmates, they
are permitted access to the inside of the institution to attend the Jumu-ah.

That Muslim inmates are able to partici-pate in Jumuah throughout the entire
federal prison system suggests that the practice is, under normal circumstances,
compatible with the demands of prison administration. Indeed, the Leesburg State
Prison permitted partici-pation in this ceremony for years, and experienced no
threats to security or safety as a result. In light of both standard federal prison
practice and Leesburgs own past practice, a reasonableness test in this case
demands at least minimal substantiation by prison of-cials that alternatives that
would permit par-ticipation in Jumuah are infeasible. Under the standard
articulated by the Court in Turner, this does not mean that petitioners are respon-
sible for identifying and discrediting these alternatives; prison ofdo not have to set
up and then shoot down every conceiv-able alternative method of accommodating
the claimants constitutional complaint. Ante, at 9091. When prisoners themselves
present alternatives, however, and when they fairly call into question ofcial claims
that these alterna-tives are infeasible, we must demand at least some evidence

beyond mere assertion that the religious practice at issue cannot be accommodated. Examination of the alternatives pro-posed in this case indicates that prison ofcials have not provided such substantiation.

*III*

Respondents proposal is that gang minimum prisoners be assigned to an alternative inside work detail on Friday, as they had been before the recent change in policy. Prison ofcials testied that the alternative work detail is now restricted to maximum security prisoners, and that they did not wish maximum and minimum security prisoners to mingle. Even the District Court had difficulty with this assertion, as it commented that the defendants did not explain why inmates of different security levels are not mixed on work assignments when otherwise they are mixed. 595 F.Supp., at 932. The court found, nonetheless, that this alternative would be inconsistent with Standard 853s mandate to move gang minimum inmates to outside work details. Ibid. This conclusion, however, neglects the fact that the very issue is whether the prisons policy, of which Standard 853 is a part, should be administered so as to accom-modate Muslim inmates. The policy itself cannot serve as a justifor its failure to provide reasonable accommodation. The record as it now stands thus does not establish that the Friday alternative work detail would create a problem for the institution.

Respondents second proposal is that gang minimum inmates be assigned to work details inside the main building on a regular basis. While admitting that the prison used inside details in the kitchen, bakery, and tailor shop, ofstated that these jobs are reserved for the riskiest gang minimum inmates, for whom an outside job might be unwise. Ibid. Thus, concluded of cials, it would be a bad idea to move these inmates outside to make room for Muslim gang mini-mum inmates. Respondents contend, how-ever, that the prisons own records indicate that there are a signicant number of jobs inside the institution that could be performed by inmates posing a lesser security risk. This suggests that it might not be necessary for the riskier gang minimum inmates to be moved outside to make room for the less risky inmates. Ofprovided no data on the number of inside jobs available, the number of high-risk gang minimum inmates perform-ing them, the number of Muslim inmates that might seek inside positions, or the number of staff that would be necessary to monitor such an arrangement. Given the plausibility of respondents

claim, prison ofcials should present at least this information in substanti-ating their contention that inside assignments are infeasible.

Third, respondents suggested that gang minimum inmates be assigned to Saturday or Sunday work details, which would allow them to make up any time lost by attending Jumuah on Friday. While prison ofadmitted the existence of weekend work details, they stated that since prison personnel are needed for other programs on weekends, the creation of additional weekend details would be a drain on scarce human resources. Ibid. The record provides no indication, however, of the num-ber of Muslims that would seek such a work detail, the current number of weekend details, or why it would be infeasible simply to reas-sign current Saturday or Sunday workers to Friday, rather than create additional details. The prison is able to arrange work schedules so that Jewish inmates may attend services on Saturday and Christian inmates may attend services on Sunday. Id., at 935. Despite the fact that virtually all inmates are housed in the main building over the weekend, so that the demand on the facility is greater than at any other time, the prison is able to provide sufstaff coverage to permit Jewish and Christian inmates to participate in their cen-tral religious ceremonies. Given the prisons duty to provide Muslims a reasonable oppor-tunity of pursuing [their] faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts, Cruz v. Beto, 405 U.S. 319, 322 (1972), prison ofshould be required to provide more than mere assertions of the infeasibility of weekend details for Muslim inmates.

Finally, respondents proposed that mini-mum security inmates living at the Farm be assigned to jobs either in the Farm building or in its immediate vicinity. Since Standard 853 permits such assignments for full mini-mum inmates, and since such inmates need not return to prison facilities through the main entrance, this would interfere neither with Standard 853 nor the concern underlying the no-return policy. Nonetheless, prison of cials stated that such an arrangement might create an afgroup of Muslims representing a threat to prison authority. Ofcials pointed to no such problem in the years in which Muslim inmates were permitted to assemble for Jumuah, and in which the alternative Friday work detail was in existence. Nor could they identify any threat resulting from the fact that during the month of Ramadan all Muslim prisoners participate in both breakfast and dinner at special times. Furthermore, there was no testimony that the concentration of Jewish or Christian inmates on work details or in religious services posed any type of afn-ity group threat. As the record now stands, prison ofhave declared that a secu-rity risk is created by a grouping of Muslim inmates in the least dangerous security clas-

sication, but not by a grouping of maximum security inmates who are concentrated in a work detail inside the main building, and who are the only Muslims assured of participating in Jummah. Surely, prison ofcials should be required to provide at least some substantia-tion for this facially implausible contention.

Petitioners also maintained that the assign-ment of full minimum Muslim inmates to the Farm or its near vicinity might provoke resent-ment because of other inmate's perception that Muslims were receiving special treatment. Of pointed to no such perception dur-ing the period in which the alternative Friday detail was in existence, nor to any resentment of the fact that Muslims dietary preferences are accommodated and that Muslims are per-mitted to operate on a special schedule during the month of Ramadan. Nor do they identify any such problems created by the accommo-dation of the religious preferences of inmates of other faiths. Once again, prison ofcials should be required at a minimum to identify the basis for their assertions.

Despite the plausibility of the alternatives proposed by respondents in light of federal practice and the prisons own past practice, ofcials have essentially provided mere pronouncements that such alternatives are not workable. If this Court is to take seri-ously its commitment to the principle that prison walls do not form a barrier separat-ing prison inmates from the protections of the Constitution, Turner, ante, at 84, it must demand more than this record provides to jus-tify a Muslim inmates complete foreclosure from participation in the central religious ser-vice of the Muslim faith.

*IV*

That the record in this case contains little more than assertions is not surprising in light of the fact that the District Court proceeded on the basis of the approach set forth in St. Claire v. Cuyler, 634 F.2d 109 (CA3 1980). That case held that mere [e] and arguably cor-rect testimony by prison ofcials is sufcient to demonstrate the need to limit prisoners exercise of constitutional rights. Id., at 114 (quoting Jones, 433 U.S., at 127). This Court in Turner, ante, p. 78, however, set forth a more systematic framework for analyzing challenges to prison regulations. Turner directed attention to two factors of particular relevance to this case: the degree of constitutional deprivation and the availability of reasonable alternatives. The respondents in this case have been abso-lutely foreclosed from participating in

the cen-tral religious ceremony of their Muslim faith. At least a colorable claim that such a drastic policy is not necessary can be made in light of the ability of federal prisons to accommodate Muslim inmates, Leesburgs own past practice of doing so, and the plausibility of the alterna-tives proposed by respondents. If the Courts standard of review is to represent anything more than redeference to prison ofcials, any nding of reasonableness must rest on rmer ground than the record now presents.

Incarceration by its nature denies a prisoner participation in the larger human community. To deny the opportunity to afrm membership in a spiritual community, however, may extin-guish an inmates last source of hope for dig-nity and redemption. Such a denial requires more justication than mere assertion that any other course of action is infeasible. While I would prefer that this case be analyzed under the approach set out in Part I, supra, I would at a minimum remand to the District Court for an analysis of respondents claims in accor-dance with the standard enunciated by the Court in Turner and in this case.

I therefore dissent.